UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: DAVOL, INC./C.R. BARD, INC.,    Case No. 2:18-md-2846
POLYPROPYLENE HERNIA MESH
PRODUCTS LIABILITY LITIGATION    CHIEF JUDGE EDMUND A. SARGUS, JR.
   Magistrate Judge Kimberly A. Jolson

This document relates to:
RYAN JOHN SAVAGE.          DOCKET NO.: 18-1662

## ORIGINAL COMPLAINT

Plaintiff files this Complaint pursuant to Case Management Order 1 and is to be bound by the rights, protections, and privileges and obligations of that Order. Plaintiff further states the following:

1. This is an action brought on behalf of Plaintiff Ryan John Savage, arising out of the failure of Defendants' hernia mesh product, Ventralight ST Mesh. As a result, Plaintiff has suffered permanent injuries and significant pain and suffering, emotional distress, mental anguish, lost wages and earning capacity, and diminished quality of life. Plaintiff respectfully seeks all damages to which he may be legally entitled.

## STATEMENT OF PARTIES

2. At all material times Plaintiff has been a citizen and resident of St. Tammany Parish, Louisiana and the United States.

3. Davol, Inc. ("Davol") is incorporated in Delaware, with its principal place of business in Rhode Island. Davol is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices. Such devices include hernia meshes composed of polypropylene, and polyglycolic acid

(PGA) fibers coated with Sepra Technology (ST), a bioresorbable, chemically modified sodium hyalurnate, carboxymethylcellulose, and polyethylene glycol based hydrogel.

4.      C.R. Bard, Inc. ("Bard") is Davol's corporate parent/stockholder.      Bard is incorporated and based in New Jersey. It is a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices, and controls the largest share of the hernia mesh market. Bard participates in the manufacture and distribution of the Ventralight ST Mesh. It also manufactures and supplies Davol with material that forms part of the product.

5.      At all material times Bard was responsible for Davol's actions, and exercised control over its functions, specific to the oversight and compliance with applicable safety standards relating to the Ventralight ST Mesh sold in the United States.  In such capacity, Bard committed, or allowed to be committed, tortious and wrongful acts, including the violation of numerous safety standards relating to device manufacturing, quality assurance/control, and conformance with design and manufacturing specifications.  Bard's misfeasance and malfeasance caused Plaintiff Ryan John Savage to suffer injury and damages.

6.      Defendants are individually and jointly and severally liable to Plaintiff Ryan John Savage for damages he suffered, arising from their design, manufacture, marketing, labeling, distribution, sale and placement of the defective Ventralight ST Mesh, effectuated directly and indirectly through their agents, servants, employees and/or owners, all acting within the course and scope of their agencies, services, employments and/or ownership.

7.      Defendants are vicariously liable for the acts and/or omissions of their employees and/or agents, who were at all material times acting on behalf of Defendants and within the scope of their employment or agency.

## VENUE AND JURISDICTION

8.     This Court has diversity subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

9.     Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to Plaintiff's claims occurred in this district.

10.     Defendants have and continue to conduct substantial business in the State of Louisiana and in the Eastern District of Louisiana, distribute ST Bard Mesh in that District, receive substantial compensation and profits from sales of ST Bard Mesh in that District, and made material omissions and misrepresentations and breaches of warranties in that District, so as so subject them to in personam jurisdiction in that District.

## FACTS COMMON TO ALL COUNTS

11.     On or about September 19, 2017, Plaintiff underwent repair of an umbilical hernia by Darren M. Rowan, M.D.  at Lakeview Regional Medical Center in Covington, Louisiana.  A Ventralight ST Mesh patch was implanted in Plaintiff during this repair.

12.     Defendants manufactured, sold, and/or distributed the Ventralight ST Mesh to Plaintiff, through his physician, to be used for treatment of hernia repair.

13.     Plaintiff continues to experience complications related to the Ventralight ST Mesh. He continues to have problems including but not limited to pain and nausea. He will likely require surgery to repair the damage from Defendants' product.

14.     Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of the Ventralight ST Mesh, including providing the warnings and instructions concerning their product.

15.     Among the intended purposes for which Defendants designed, manufactured and sold the product was its use by surgeons for hernia repair surgeries.   That was the purpose for which the Ventralight ST Mesh was implanted in Plaintiff Ryan John Savage.

16.     Defendants represented to Plaintiff and his physician that the Ventralight ST Mesh was a safe and effective product for hernia repair.

FDA 501(k) CLEARANCE PROCESS

17.     The "510(k) clearance process" of the U.S. Food & Drug Administration (FDA) refers to Section 510(k) of the 1976 Medical Device Amendments to the Federal Food, Drug and Cosmetic Act (MDA).   Under this process, medical device manufacturers are only required to notify the FDA at least 90 days before they market a device claimed to be "substantially equivalent" to a device the FDA had approved for sale before 1976 (when the MDA was enacted).

18.     No clinical testing or clinical study is required to gain FDA approval under this process.     Instead, a given device was supposed to demonstrate substantial equivalence to a predicate medical device.

19.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA, 510(k)-cleared devices.

20.     Through this domino effect, devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices the FDA had approved for sale pre-1976 could be sold to patients in a matter of 90 days-without any clinical testing.

21.     Therefore, clearance for sale under the 510(k) process does not equate to FDA approval of the cleared medical device.

22.     At the request of the FDA in 2012, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, reaching the following major conclusion:

> The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.

23.     The NIH explained: "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH even pointed out that the classification of predicate devices approved for sale prior to 1976 "did not include any evaluation of the safety and effectiveness of individual medical devices ...Thus it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

24.     Defendants cleared their Ventralight ST Mesh, and its related components, under the 510(k) Premarket Notification.

25.     On June 18, 2002, the FDA issued a document entitled "Guidance for Resorbable Adhesion Barrier Devices for Use in Abdominal and/or Pelvic Surgery; Guidance for Industry." The 26-page document starts by explaining:

> FDA has determined that the resorbable adhesion barrier is a significant risk device as defined in 21 CFR 812.3(m)(4). The resorbable adhesion barrier is a Class III device which is subject to premarket approval in accordance with section 515 of the Federal Food, Drug, and Cosmetics (FD&C) Act.

ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS

26.     Due to Defendants' acts of fraudulent concealment, they are estopped from relying on any statutes of limitations or repose. Such acts include Defendants' intentional concealment

from Plaintiff Ryan John Savage and the general public that the Ventralight ST Mesh is defective, while continuing to market the product with the adverse effects described in this Complaint.

27.     Given Defendants' affirmative actions of concealment by failing to disclose information about the defects known to them but not the public-information over which Defendants had exclusive control-and because Plaintiff could not reasonably have known the Ventralight ST Mesh was defective, Defendants are estopped from relying on any statutes of limitations that might overwise be applicable to the claims asserted in this Complaint.

<u>COUNT I:  MANUFACTURING DEFECT AND<br>BREACH OF THE WARRANTY OF REDHIBITION</u>

28.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

29.     Defendants expected and intended their Ventralight ST Mesh to reach users such as Plaintiff in the condition in which the product was sold.

30.     The implantation in Plaintiff Ryan John Savage' body of the Ventralight ST Mesh was medically reasonable, and was a type of use that Defendants intended and foresaw when they designed, manufactured and sold the product.

31.     When the Ventralight ST Mesh was implanted in Plaintiff's body, the product was defectively manufactured.

32.     Defendants' poor-quality control and general non-compliance with good manufacturing standards resulted in the non-conformance of the Ventralight ST Mesh implanted in Plaintiff.  The implanted product did not conform to Defendants' intended manufacturing and design specifications.

33.     Upon information and belief, Defendants utilized substandard and adulterated polypropylene and raw materials used to make the ST coating on their finished Ventralight ST Mesh product, which deviated from their material and supply specifications.

34.     The Ventralight ST Mesh, at the time of manufacture and sale, was defective in design and unreasonably dangerous, subjecting users to premature failures.

35.     The Ventralight ST Mesh failed prematurely regardless of the fact that the Ventralight ST Mesh was used in the manner for which it was intended.

36.     As a direct and proximate result of Defendants' defective manufacture of the Ventralight ST Mesh, Plaintiff suffered injuries and damages as summarized in this Complaint.

37.     Defendant, as designer, manufacturer, marketer, and seller of medical products, and particularly surgical mesh, is held to the level of knowledge of an expert in its field, and Plaintiff did not have substantially the same knowledge.

38.     Due to the above, the Ventralight ST Mesh was defective as defined by the Louisiana Products Liability Act (Louisiana Revised Statute 9:2800.51, et seq.) including, but not limited to, having defects in design, composition, manufacture and inadequate warnings and instructions regarding the use and reasonably foreseeable misuse of the product.

39.     The component parts contained in the Ventralight ST Mesh failed as described throughout this Complaint inside of Plaintiff's body which rendered the mesh defective and Defendant, as manufacturer and vendor is liable to Plaintiffs under the law of redhibition (Louisiana Civil Code Article 2509 as a bad faith seller and Louisiana Civil Code Article 2520, for economic loss et seq.).

## COUNT II: DESIGN DEFECT

40.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

41.     Defendants' Ventralight ST Mesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design.  As a result of the defective design

and/or manufacture of the product, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components, including: chronic pain; recurrence of hernia; foreign body response; rejection; infection; scarification; improper wound healing; excessive and chronic inflammation; allergic reaction; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tumor formation, cancer, tissue damage and/or death; and other complications.

42.     When affixed to the body's tissue, the impermeable coating of the ST Mesh prevents fluid escape, which leads to seroma formation, and which in turn can cause infection or abscess formation and other complications.

43.     The ST coating provides an ideal bacteria breeding ground in which bacteria cannot be eliminated by the body's immune response, thus allowing infection to proliferate.

44.     Defendants utilize Ethylene Oxide ("ETO") in an attempt to sterilize the ST Mesh. Although ETO is an effective disinfectant, dry spores are highly resistant to ETO. Moisture must be present to eliminate spores if ETO is used. Presoaking the product to be sterilized is most desirable, but high levels of humidity during the ETO process can also be effective in eliminating spores.

45.     The ST Mesh, containing spores, will eventually cause an infection after implantation. The spores can remain dormant for extended periods of time, resulting in infections months or years after ST Mesh was implanted. The following literature discusses the necessity of moisture during ETO sterilization:

> In January of 1989, a review on sterilization methods of medical devices was published in the Journal of Biomaterials Applications. ETO was among the sterilization methods reviewed. ETO was noted to be highly resistant to dry spores, moisture must be present; presoaking most desirable. Experiments demonstrated the importance of the state of humidification of organisms at the

time of their exposure to ETO. Desiccation of the spores prior to ETO exposure produces a small but significant percentage of organisms which are highly resistant to the sterilization process. Similar resistance to destruction by ETO occurs in desiccated staphylococcus aureus. Rehumidification of such organisms can require prolonged exposure to an atmosphere having a 50 to 90 percent relative humidity. Moisture has been found to be a critical factor in achieving sterility with gaseous ETO. No gas sterilizer can effectively kill desiccated spores.

Dempsey, D.J. and Thirucote, R.R., Sterilization of medical devices: A Review. Journal of Biomaterials Applications, 3(3), pp. 454-523 (1988). DOI: 10.1177/088532828800300303

46.     Defendants' Ventralight ST Mesh is acidic, causing bacteriostasis (inhibition of the growth of bacteria without killing the bacteria), and resulting in the inability to properly validate sterilization.

47.     The coating on Defendants' product is cytotoxic, immunogenic, and non-biocompatible, causing or contributing to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

48.     The ST coating is designed and intended to resorb in less than 30 days.

49.     When the ST coating is disrupted, degrades, and/or resorbs, the "naked" polypropylene mesh and polyglycolic acid (PGA) are exposed to the adjoining tissue and viscera. The mesh can thus become adhered to organs and cause incarceration of organs, and fistula formation.

50.     The solid, flat, relatively smooth and continuous surface of Defendants' Ventralight ST Mesh inhibits the body's ability to clear toxins.

51.     These manufacturing and design defects associated with the Ventralight ST Mesh were directly and proximately related to the injuries Plaintiff Ryan John Savage suffered.

52.     Neither Plaintiff nor his implanting physician was adequately warned or informed by Defendants of the defective and dangerous nature of Ventralight ST Mesh. Moreover, neither Plaintiff nor his implanting physician was adequately warned or informed by Defendants of the risks associated with the product.

53.     The Ventralight ST Mesh implanted in Plaintiff failed to reasonably perform as intended. The product caused serious injury and will require surgical removal via invasive surgery, necessitating additional invasive surgery to repair the hernia that the product had initially been implanted to treat.

54.     When the Ventralight ST Mesh was implanted in Plaintiffs body, it was defectively designed. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

55.     Defendants expected and intended the Ventralight ST Mesh to reach users such as Plaintiff in the condition in which the product was sold.

56.     The implantation of the product in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended. and foresaw when they designed, manufactured and sold it.

57.     The risks of Defendants' Ventralight ST Mesh significantly outweigh any benefits that Defendants contend could be associated with the product. The ST coating-which is not used in any other hernia mesh product sold in the United States-incites an intense inflammatory response, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. The impermeable ST coating leads to seroma formation, and provides a breeding

ground for infection by protecting bacteria from being eliminated through the body's natural immune response. This ST coating also causes immunogenic responses, and was known to be cytotoxic.

58.    The coating of the Ventralight ST Mesh, which was marketed, promoted and intended as a barrier against adhesion to the bowel, was only temporary; it was expected and intended to degrade over time inside the body. Thus, the coating prevented tissue ingrowth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh and PGA exposed to the internal viscera and tissues. Once exposed to the viscera, the polypropylene and PGA will inevitably adhere to the viscera, initiating a cascade of adverse consequences. Any purported beneficial purpose of the coating (to prevent adhesion to the bowel and internal viscera) was non-existent; the product provided no benefit while substantially increasing the risks to the patient.

59.    The polypropylene mesh within the defective coating of the Ventralight ST Mesh was in itself dangerous and defective, particularly when used in the product in the manner intended by Defendants. The particular polypropylene material used in their product was substandard, adulterated and non-medical grade, and was unreasonably subject to oxidative degradation within the body, further exacerbating the adverse reactions to the product once the ST coating degraded. When implanted adjacent to the bowel and other internal organs, as Defendants intended for the Ventralight ST Mesh, it is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

60.     The appropriate treatment for complications associated with the Ventralight ST Mesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the product was intended to provide to the patient.

61.     Defendants' product was designed and intended for intraperitoneal implantation, which required it to be placed in contact with internal organs, thus unnecessarily increasing the risks of adhesion, erosion, fistula formation, and other injuries.

62.     When the Ventralight ST Mesh was implanted in Plaintiff Ryan John Savage, there were safer feasible alternative designs for hernia mesh products, including a flat, non-coated, single- layer mesh placed away from the bowel.

63.     The Ventralight ST Mesh product costs significantly more than competitive products due to its unique ST coating, even though the ST coating  provided no benefit to consumers, and increased the risks to patients implanted with these devices.

64.     Defendants' Ventralight ST Mesh has a solid, flat, relatively smooth and continuous surface. Medical devices utilizing this design greatly increase the risk of tumor and cancer formation via the "Oppenheimer Effect":

> In 1958, a study supported  by a research grant from the National Cancer Institute titled The Latent Period in Carcinogenesis by Plastics in Rats and its Relation to the Presarcomatous Stage was published in the Journal  of Cancer. The  presence  of  polymer in a sheet  form  appears to be of primary  importance,  as  shown  by the  manifold  increase in  the percentage of tumors induced  by this  form,  as  opposed   to textiles, sponges,  powders, etc. This may  act in some way as a block to the free interchange of tissue constituents, subjecting some  cells to an altered environment  and changing  their  pattern  of  growth. Whether the primary  cause  is lack  of  nutrients or oxygen,  or the  accumulation of products of metabolism, or even  a freeing  of the cell from  some hormonal control, is not  at  present clear, but  undoubtedly  the  cell is placed under   conditions   that   are   favorable   to   autonomous, unregulated growth. Plastics embedded subcutaneously in rodents in film  or sheet  form   induce   malignant tumors in significant

numbers (up to 50%), but embedded in other forms, such as textiles, sponges, or powders, they induce tumors only rarely.

Oppenheimer, B.S. et al, *The Latent Period in Carcinogenesis by Plastics in Rats and its Relations to the Presearcomatous Stage.* Journal of Cancer 1(11). 204 - 213 (1958).

In 1999, the World Health Organization's International Agency for Research on Cancer published Surgical implants and Other Foreign Bodies, which evaluated the carcinogenic risks of various surgical implants in humans. Polymeric implants prepared as thin smooth films are possibly carcinogenic to humans.

*Surgical Implants and Other Foreign Bodies.* IARC Monogr Eval Carcinog Risks Hum 74:1-409 (1999).

65.    Plaintiff was implanted with Defendants' Ventralight ST Mesh product, which also includes an inner ring of polydioxanone (PDQ ring), to aid in the memory and stability of the device. The inner PDO ring is called SorbaFlex Memory Technology.

66.    Once implanted, the PDQ ring breaks down via hydrolysis over a period of at least 6 to 8 months. The PDQ ring elicits an intense inflammatory response during absorption.

67.    The Ventralight ST Mesh is vulnerable to buckling, folding, and/or migrating once the PDO ring has absorbed.

68.    Defendants secure the ST coating to the polypropylene base of the mesh by suturing two circular rings of PGA. The two securing circular rings of PGA are not ST coated and are the closest part of the mesh to underlying organs once implanted. This results in significant amounts of bare PGA being exposed to underlying organs at the time of implantation.

69.    The two circular rings of PGA securing the ST coating to the polypropylene have a tendency to come unstitched, resulting in segments of PGA protruding toward the underlying organs.

70. The method by which Defendants secure the ST coating to the polypropylene base of the mesh does not provide adequate or uniform coverage to the outer aspects of the base polypropylene from the time of implantation.

71. The securing circular rings of PGA do not extend to the outer aspects of the polypropylene base, which can result in the ST coating folding upon itself and exposing bare polypropylene.

72. The positioning/securing strap of the Ventralight ST Mesh is bare polypropylene without an ST coating.

73. The Instructions for Use for the Ventralight ST Mesh direct the implanting surgeon to secure it with tacks or sutures through the polypropylene positioning straps.

74. The polypropylene positioning straps have a tendency to tear at the base of the Ventralight ST Mesh after implantation, resulting in mesh migration and other injuries.

75. The polypropylene positioning straps have a tendency to tear where tacked or sutured, resulting in mesh migration and other injuries.

76. The polypropylene portion of the Ventralight ST Mesh has a tendency to unravel, creating a sharp "fishing line" effect, which can slice through the patient's tissue.

77. The additional layers utilized to create the patch of the Ventralight ST Mesh increase the intensity and duration of inflammation and foreign body response.

78. The Ventralight ST Mesh implanted in Plaintiff Ryan John Savage failed to reasonably perform as intended. The product therefore will have to be surgically removed necessitating further invasive surgery to repair the very issue that the Ventralight ST Mesh was intended to repair. The product thus provided no benefit to Plaintiff.

79. The Ventralight ST Mesh at the time of manufacture and sale, was defective in design and unreasonably dangerous, subjecting users to premature failures.

80. The Ventralight ST Mesh failed prematurely regardless of the fact that the Ventralight ST Mesh was used in the manner for which it was intended

81. The Ventralight ST Mesh implanted in Plaintiff, David W. Trussell was inherently dangerous for its intended use due to the following:

a) The Ventralight ST Mesh was not reasonably safe as intended to be used;

b) The Ventralight ST Mesh had an inadequate design;

c) The Ventralight ST Mesh contained unreasonably dangerous design defects including an inherently unstable and defective design that resulted in an unreasonably high probability of early failure;

d) The Ventralight ST Mesh's unstable and defective design resulted in a surgical mesh which was more dangerous than the ordinary consumer would expect;

e) The Ventralight ST Mesh failed to perform in a manner reasonably expected in light of its nature and intended function and subjected the Plaintiff to an unreasonable risk of harm beyond that contemplated by an ordinary person; and

f) The Ventralight ST Mesh was insufficiently tested or studied as intended by the FDA.

82. As a direct and proximate result of the product's defective and unreasonably dangerous condition, Plaintiff suffered injuries and damages as summarized in this Complaint.

<u>COUNT III – FAILURE TO WARN</u>

83. Plaintiff incorporates by reference the allegations in all prior paragraphs.

84.    When the Ventralight  ST Mesh  was implanted  in Plaintiffs body, the warnings and instructions provided  by Defendants for the product  were inadequate and defective.  As described above, there  was an unreasonable risk the product  would  not perform safely  and effectively for the purposes for which it was intended.   Defendants failed  to design  and/or manufacture against such dangers,  and failed to provide adequate  warnings  and instructions concerning these risks.

85.    Defendants expected  and intended  the Ventralight  ST Mesh  to reach users  such as Plaintiff  in the condition in which the product  was sold.

86.    Plaintiff  Ryan John Savage and  Plaintiff's  physicians were unaware of the defects and dangers  of Ventralight ST Mesh, and were  unaware  of the frequency, severity  and duration of the risks associated  with the product.

87.    Defendants'  Instructions for Use provided with the Ventralight ST Mesh expressly understate  and misstate  the risks known  to be associated  specifically  with the  product, representing  the associated  complications  such  as  inflammation  merely  as  "possible complications."  But  the Ventralight  ST Mesh  will always incite  severe inflammation  once implanted. The inflammation  caused by the  Ventralight  ST Mesh  is chronic  in nature and systemic, not acute localized inflammation.

88.    No other surgical mesh sold in the United States has the dangerous and defective ST  coating,  which  itself  causes or  increases  the  risks  of  numerous  complications,  including increased  risk  of seroma  formation,  immunologic response,  increased risk for infection, and increased inflammatory reaction and foreign body response.  Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the Ventralight ST Mesh.

89.     Defendants' Instructions for Use for the product also failed to adequately warn Plaintiff's physician of numerous risks that Defendants knew or should have known were associated with the Ventralight ST Mesh, including the risks of immunologic response, pain, dehiscence, encapsulation, rejection, migration, scarification, contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, bowel obstruction, or hernia incarceration or strangulation.

90.     Defendants failed to adequately warn Plaintiff or his physician about the necessity for invasive surgical intervention in the event of complications and failed to train the physician how to properly treat such complications when they occurred.

91.     Defendants failed to adequately warn Plaintiff or his physician that the surgical removal of the Ventralight ST Mesh in the event of complications would leave the hernia unrepaired and much larger than the original; and would necessitate further, more complicated medical treatment to attempt to repair the same hernia that the failed product was intended to treat.

92.     Defendants represented to physicians, including Plaintiff's physician, that the ST coating would prevent or reduce adhesions; expressly intended for the ST Mesh to be implanted in contact with the bowel and internal organs; and marketed and promoted the Ventralight ST Mesh for that purpose. Defendants failed to warn physicians that the ST coating was temporary, and therefore at best would provide only a temporary adhesion barrier. Further, Defendants did not warn physicians that when the coating inevitably degraded, the exposed polypropylene and PGA would become adhered to the bowel or tissue.

93.     Defendants failed to warn Plaintiff and his physician that the FDA considered the Ventralight ST Mesh device a significant risk.

94. Defendants marketed and continue to market the Ventralight ST Mesh in brochures and online without disclosing or making evident that PGA is utilized in the product.

95. With respect to the complications listed in the Defendants' warnings, they provided no information or warning regarding the frequency, severity and duration of those complications, even though the complications associated with the Ventralight ST Mesh were more frequent, more severe and longer lasting than those with safer feasible alternative hernia repair treatments.

96. If Plaintiff and/or his physician had been properly warned of the defects and dangers of the Ventralight ST Mesh, and of the frequency, severity and duration of the risks associated with the product, Plaintiff would not have consented to allow it to be implanted, and Plaintiffs physician would not have implanted the product in Plaintiff.

97. As a direct and proximate result of the. inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized in this Complaint.

## COUNT IV: NEGLIGENCE

98. Plaintiff incorporates by reference the allegations in all prior paragraphs.

99. Although Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for the Ventralight ST Mesh, they failed to do so.

100. Defendants knew, or in the exercise of reasonable care should have known, that their product was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom it was implanted. Defendants knew or should have known that Plaintiff and his physician were unaware of the dangers and defects inherent in the Ventralight ST Mesh.

101.    Defendants knew or should have known that the Material Safety Data Sheet regarding the polypropylene used to manufacture their product prohibited permanently implanting polypropylene into the human body.

102.    Defendants utilized non-medical grade polypropylene.

103.    Defendants knew or should have known that polypropylene is not inert and will degrade, flake, chip, and disperse throughout the body once implanted.

104.    Defendants knew or should have known that polypropylene induces a severe inflammatory response once implanted, and continues to induce a severe inflammatory response indefinitely or until removed.

105.    Defendants knew or should have known that every piece of polypropylene that flakes off and migrates throughout the body also incites its own chronic inflammatory response wherever it embeds.

106.    Defendants knew or should have known that PGA (polyglycolic acid) induces an intense local inflammatory response following implantation.

107.    Defendants knew or should have known that carboxymethylcellulose induces an intense local inflammatory response following implantation.

108.    Defendants knew or should have known of the cytotoxic and immunogenic properties of the coating on the Ventralight ST Mesh before introducing it into the stream of commerce.

109.    As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for the Ventralight ST Mesh, Plaintiff suffered injuries and damages as summarized in this Complaint.

<u>COUNT V: BREACH OF IMPLIED WARRANTY</u>

110.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

111.    At all material times, Defendants manufactured, marketed, sold, distributed and otherwise placed in to the stream of commerce the Ventralight ST Mesh.

112.    At all material times, Defendants intended for their product to be implanted for the purposes and in the manner than Plaintiff and his implanting physician in fact used it; and Defendants impliedly warranted that the product and is component parts was of merchantable quality, safe and fit for such use, and adequately tested.

113.    Defendants were aware that consumers including Plaintiff and his physician, would implant their product as directed by the Instructions for Use. Therefore, Plaintiff was a foreseeable user of Defendants' Ventralight ST Mesh.

114.    Defendants' Ventralight ST Mesh was expected to reach, and did in fact reach consumers, including Plaintiff and his physician, without substantial change in the condition in which it was manufactured and sold by Defendants.

115.    Defendants breached various implied warranties with respect to Ventralight ST Mesh, including the following:

A.  Defendants represented to Plaintiff and his physician and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that their product was save. But at the same time they fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the product;

B.  Defendants represented to Plaintiff and his physician and healthcare providers that their product was safe and/or safer than other alternative procedures and devices. But at the same time they

fraudulently concealed information demonstrating that the product was not safer than alternatives available on the market; and

C. Defendants represented to Plaintiff and his physician and healthcare providers that their product was more efficacious than alternative procedures and/or devices. But at the same time they fraudulently concealed information regarding the true efficacy of the Ventralight ST Mesh.

116. In reliance upon Defendants' implied warranties, Plaintiff, individually, and/or by and through his physician, used the Ventralight ST Mesh as prescribed, and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

117. Defendants breached their implied warranties to Plaintiff in that their product was not of merchantable quality, nor was it safe and fit for its intended use or adequately tested.

118. As a direct and proximate result of Defendants' breaches of the aforementioned implied warranties, Plaintiff was caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including obligations for medical services and expenses, impairment of personal relationships, and other damages.

COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

119. Plaintiff incorporates by reference the allegations in all prior paragraphs.

120. Defendants negligently manufactured, designed, developed, tested, labeled, marketed and sold the Ventralight ST Mesh to Plaintiff.

121. On multiple occasions Defendants negligently concealed the harmful effects of the product from Plaintiff individually, and/or his physician.. They continue to do so to this day.

122. On multiple occasions Defendants carelessly and negligently misrepresented the quality, safety and efficacy of the Ventralight ST Mesh to Plaintiff individually, and/or his physician. They continue to do so to this day.

123.    Plaintiff was directly impacted by Defendants' negligence, in that he has sustained and will continue to sustain emotional distress, severe physical injuries, economic losses, and other damages as a direct result of the decision to purchase the product manufactured, sold and distributed by Defendants.

124.    After Plaintiff sustained emotional distress, severe physical injuries, and economic loss, Defendants continued to negligently misrepresent the quality, safety, efficacy, dangers and contraindications of their product to Plaintiff and/or his physician.

125.    Defendants continued to negligently misrepresent the quality, safety, efficacy, dangers and contraindications of their product to Plaintiff individually, and/or his physician, knowing that doing so would cause Plaintiff to suffer additional and continued emotional distress, severe physical injuries, and economic loss.

126.    As a proximate result of Defendants' conduct, Plaintiff has been injured.  He has sustained severe and permanent pain, suffering, anxiety, depression, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

<u>COUNT VII: FRAUDULENT CONCEALMENT</u>

127.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

128.    At all material times it was known or knowable to Defendants that their product caused large numbers of complications.  It also was known or knowable to Defendants that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with the Ventralight ST Mesh.  It was known or knowable to Defendants that the safety and efficacy of their product had not been proven with respect to, among other things, the product, its components, its performance, and its method of insertion.  And it was known or

knowable to Defendants that the product was not safe and effective. Defendants continued nonetheless to represent that their product was safe and effective.

129.    Despite what was known or knowable to Defendants about the lack of safety and efficacy of their product, Defendants failed to disclose this information to Plaintiff, his physician, and/or public at large.

130.    At all material times, Defendants had the duty and obligation to disclose to Plaintiff and his physician the true facts concerning their product, i.e., that the Ventralight ST Mesh was dangerous and defective, lacking efficacy for its purported use and lacking safety in normal use, and was likely to cause serious consequences to users, including permanent and debilitating injuries. Defendants concealed these material facts before Plaintiff Ryan John Savage was implanted with Defendants' product.

131.    Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of the product because:

A.  Defendants were in a superior position to know the true quality, safety, and efficacy of the Ventralight ST Mesh;

B.  Defendants knowingly made false claims about the safety and quality of the product in documents and marketing materials; and

C.  Defendants fraudulently and affirmatively concealed the defective nature of their product from Plaintiff.

132.    The facts Defendants concealed and/or did not disclose to Plaintiff were material facts that a reasonable person would have considered important in deciding whether to purchase and/or use Defendants' product.

133. At all material times, Defendants willfully, intentionally, and maliciously concealed facts from Plaintiff and his physician, with the intent to defraud them.

134. Defendants intentionally concealed or failed to disclose the true defective nature of the Ventralight ST Mesh, so that Plaintiff would request and purchase it, and healthcare providers would dispense, prescribe, and recommend it. And Plaintiff justifiably acted or relied upon the concealed or non-disclosed facts to his detriment.

135. At all material times, neither Plaintiff nor his physician was aware of the facts above. Had they been aware of those facts, they would not have acted as they did, i.e., by reasonably relying upon Defendants' representations of safety and efficacy, and by utilizing Defendants' product. Defendants' failure to disclose this information was a substantial factor in the selection by Plaintiffs physician of Defendants' product. Defendants' failure to disclose also resulted in the provision of incorrect and incomplete information to Plaintiff as a patient.

136. Defendants breached both implied and express warranties, and was guilty of misrepresentations, breach of contract, fraud and deceptive business practices as defined under Louisiana law.

137. As a direct and proximate result of Defendants' conduct, Plaintiff was injured.

## COUNT VIII: NEGLIGENT MISREPRESENTATION

138. Plaintiff incorporates by reference the allegations in all prior paragraphs.

139. Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, and the public, that the Ventralight ST Mesh had not been adequately tested and found to be a safe and effective treatment. Defendants breached that duty as their representations were false.

140. Defendants failed to exercise ordinary care in the representations concerning their product while they were involved in its manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because they negligently misrepresented the Ventralight ST Mesh's high risk of unreasonable and dangerous adverse side effects.

141. Defendants also breached their duty in representing to Plaintiff, his physician, and the medical community that their product had no serious side effects different from older generations of similar products and/or procedures.

142. As a foreseeable, direct, and proximate result of Defendants' negligent misrepresentations, they knew or had reason to know, that the Ventralight ST Mesh had been insufficiently tested, or had not been tested at all; and that it lacked adequate and accurate warnings, and created a high risk, or a higher than acceptable reported and represented risk of adverse side effects. Those side effects include pain, graft rejection, graft migration, organ damage, complex seroma, fistula, sinus tract formation, delayed wound closure, infection, sepsis, and death.

143. As a direct and proximate result of Defendants' conduct, Plaintiff has been injured and sustained past and future severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

<u>PUNITIVE DAMAGES</u>

144. Plaintiff incorporates by reference the allegations in all prior paragraphs.

145. Defendants failed to adequately test and study the Ventralight ST Mesh to determine and ensure that the product was safe and effective prior to releasing it for sale for permanent human implantation. Further, Defendants continued to manufacture and sell the

product after obtaining knowledge and information that it was defective and unreasonably unsafe.

146.     Even though Defendants have other hernia repair mesh devices that do not present the same risks as the Ventralight ST Mesh, they developed, designed and sold the Ventralight ST Mesh, and continue to do so, because the product has a significantly higher profit margin than other hernia repair products.    Defendants were aware of the probable consequences of implantation of the dangerous and defective product, including the risk of failure and serious injury, such as suffered by Plaintiff.

147.     At all material times, Defendants knew or should have known that Ventralight ST Mesh was inherently more dangerous with respect to the following: the risk of foreign body response, allergic reaction, rejection, infection, failure, erosion, pain and suffering, organ perforation, dense adhesions, tumor or cancer formation, loss of life's enjoyment, remedial surgeries and treatments to cure the conditions proximately related to the use of the product, as well as the other permanent and lasting severe personal injuries.

148.     Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of the Ventralight ST Mesh, which deprived Plaintiff and his implanting physician of vitally necessary information with which to make a fully informed decision about whether to use the product.

149.     At all material times, Defendants also knew and recklessly and/or intentionally disregarded the fact that their product can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative methods, products, procedures, and/or

treatments. But Defendants recklessly failed to advise the medical community and the general public, including Plaintiffs, of that fact.

150. At all material times, Defendants intentionally misstated and misrepresented data; and they continue to misrepresent data so as to minimize the perceived risk of injuries and the rate of complications caused by or associated with the Ventralight ST Mesh.

151. Notwithstanding the foregoing and the growing body of knowledge and information regarding the true and defective nature of the Ventralight ST Mesh, with its increased risk of side effects and serious complications, Defendants continue to aggressively market the product to the medical community and to consumers without disclosing the true risk of the complications and side effects.

152. When Plaintiff Ryan John Savage was implanted with the Ventralight ST Mesh and since then, Defendants have known the product was defective and unreasonably dangerous. But they continued to manufacture, produce, assemble, market, distribute, and sell Ventralight ST Mesh so as to maximize sales and profits at the expense of the health and safety of the public in a conscious, reckless and/or intentional disregard of the likely and foreseeable harm caused by the product to members of the public, including Plaintiff.

153. At all material times, Defendants have concealed and/or failed to disclose to the public the serious risks and the potential complications associated with the product, so as to ensure continued and increased sales and profits and to the detriment of the public, including Plaintiff.

154. Defendants' acts and omissions are of such character and nature so as to entitle Plaintiff to an award of punitive damages in accordance with applicable statutory and common law. Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that

entire want of care, raising the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff Ryan John Savage demands judgment against Defendants individually and jointly and severally. Plaintiff also requests compensatory damages, punitive damages or enhanced compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

<u>PRAYER FOR RELIEF</u>

Plaintiff Ryan John Savage demands judgment against Defendants, individually and jointly and severally, and prays for the following relief in accordance with applicable law and equity:

a) Compensatory damages to Plaintiff for past, present, and future damages, including pain and suffering for severe and permanent personal injuries sustained by Plaintiff; permanent impairment, mental pain and suffering, loss of enjoyment of life, health and medical care costs, lost wages, loss of earning capacity, and other economic damages, together with interest and costs as provided by law;

b) Past, present and future disfigurement;

c) Restitution and disgorgement of Defendants' profits;

d) Punitive or enhanced compensatory damages;

e) Reasonable attorneys' fees as provided by law;

f) Past and future costs of all proceedings;

g) All ascertainable economic damages;

h) Judicial interest on all damages as allowed by law; and

i) Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.


Date:   12/12/2018                  Respectfully submitted,

                                    ALLAN BERGER & ASSOCIATES, P.L.C.


                                      /s/ Andrew Geiger
                                    ALLAN BERGER (BAR NO. 2977)
                                    ANDREW J. GEIGER (BAR NO. 32467)
                                    **ALLAN BERGER & ASSOCIATES PLC**
                                    4173 Canal Street New Orleans, Louisiana 70119
                                    Telephone: (504) 486-9481
                                    Fax: (504) 483-8130